## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### CASE NO. 5:18-cv-00324-PGB-PRL

MARY BETH HEINERT and RICHARD
H. SCHULTZ, JR., on behalf of themselves
and all others similarly situated,

      Plaintiffs,

v.

BANK OF AMERICA, N.A., PERRY SANTILLO,
CHRISTOPHER PARRIS, PAUL ANTHONY
LAROCCO, JOHN PICCARRETO, and
THOMAS BRENNER,

      Defendants.

_____/

**CLASS ACTION**

**JURY DEMAND**

### AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL[1]

Plaintiffs Mary Beth Heinert and Richard H. Schultz, Jr., on behalf of themselves and all others similarly situated, sue Bank of America, N.A., Perry Santillo, Christopher Parris, Paul Anthony LaRocco, John Piccarreto, and Thomas Brenner, and state:

### INTRODUCTION

1.    Plaintiffs bring this action on behalf of a proposed class of approximately 637 investors across the United States who are victims of a Ponzi scheme which has raised at least $102 million since 2011.

2.    The orchestrators of the scheme — Santillo, Parris, Piccarreto, LaRocco, and Brenner (collectively the "Individual Defendants") — duped their victims into investing in one or

---

[1] Plaintiffs file this Amended Class Action Complaint in accordance with the Court's August 10, 2018 Order (DE 38).

more of the Individual Defendants' companies using uniform fraudulent offering materials under the pretense that the companies would invest in financial services, insurance, real estate development, or medical laboratories.

3.      These investments were a sham.  In classic Ponzi-scheme fashion, the Individual Defendants used newly acquired investor funds to pay off previous investors, and stole what was left to fund a jet-setting lifestyle, paying for homes across the country, cars, expenses at a country club and Las Vegas resort and casino, credit card payments, and other personal expenses. During the commission of the fraud, Santillo commissioned a song about himself and played it during a lavish party at a Las Vegas nightclub. The lyrics describe him as "King Perry," characterize his attire as "ten thousand dollar suits everywhere he rides," and refer to Perry "pop[ping] champagne in L.A., New York to Florida; buy another bottle just to spray it all over ya."

4.      The Individual Defendants disbursed investors' funds with no regard for the investors' agreements, instructions, or intentions. Of the at least $102 million raised, most, if not all, was either stolen by the Individual Defendants or paid back to earlier investors to allow the Ponzi to survive.

5.      The Individual Defendants could not have perpetuated their scheme without the knowing and substantial assistance of their longstanding primary banking institution, Bank of America, N.A. ("Bank of America" or the "Bank"), with which the Individual Defendants had a personal and business banking relationship. The Individual Defendants opened their first accounts at Bank of America in 2005, and, over time, developed a close relationship with their primary contact at the Bank, Rochester Branch Manager Derline Cunningham.

6.      Bank of America lent the scheme an air of legitimacy and provided critical support, including at times when the scheme would have otherwise collapsed.

7.      As part of what functioned as a single and integrated scheme, the Individual Defendants primarily used three issuer companies to raise the bulk of the $102 million: First Nationle Solutions, Percipience Global Corporation, and United RL Capital Services. The Individual Defendants also used a variety of smaller companies to perpetuate the scheme. These entities, controlled by the Individual Defendants (and collectively referred to as the "First Nationle Entities"), together had at least one hundred Bank of America accounts.

8.      Indeed, since at least 2005, the Individual Defendants used accounts at Bank of America, both business and personal, to commingle and divert stolen investor funds. The Individual Defendants would often transfer hundreds of thousands of dollars into accounts with relatively small balances, no balances, or negative balances, and then transfer the bulk of those funds to different accounts or to redeeming investors within the same day or week. Over the course of years, many series of transactions followed this practice, some involving over ten Bank of America accounts fraudulently transferring the same funds.

9.      Santillo misappropriated at least $13.4 million using Bank of America accounts.

10.     Parris misappropriated at least $1.1 million using Bank of America accounts.

11.     LaRocco misappropriated at least $1.1 million using Bank of America accounts.

12.     Piccarreto misappropriated at least $1.3 million using Bank of America accounts.

13.     Brenner misappropriated at least $2.9 million using Bank of America accounts.

14.     The Individual Defendants orchestrated, and Bank of America assisted, the scheme by implementing an intricate web of transfers among at least one hundred accounts at Bank of America to disguise the fact that the investments were a sham. Bank of America acquired knowledge that the Individual Defendants were engaging in fraudulent activity from various

sources, including the Individual Defendants' misuse of millions of dollars of investor money through Bank of America accounts.

15.     Bank of America gained further, specific knowledge of the nature of the Individual Defendants' scheme in or around 2014 during an internal Bank of America investigation.  As part of that investigation, Bank of America questioned Parris by email, and then again at an in-person meeting, regarding the unusual nature of the account openings, the unusually large quantity of account openings, and the atypical nature and amount of the transfers being processed through the First Nationle accounts.

16.     Bank of America also questioned Santillo in person in connection with the Bank's investigation.

17.     Notwithstanding the Bank's investigation — and the fact that Santillo, Parris, and the Individual Defendants had been perpetrating a Ponzi scheme since at least 2005 — Bank of America allowed the Individual Defendants to continue processing transactions through their accounts, and did nothing to prohibit or deter their wrongdoing.  Bank of America continued to serve as the primary banking institution for the First Nationle entities until 2016 — two years after it conducted its investigation into the First Nationle accounts — during which time the Individual defendants continued and expanded their fraud.

18.     In or around 2015, and notwithstanding their own financial difficulties, Santillo and Parris gave Derline Cunningham, their primary Bank of America contact since 2005, a personal financial "loan" to assist with her own financial troubles. Upon information and belief, Ms. Cunningham never repaid the "loan."

19.     It was not until 2016, when the Individual Defendants began incurring negative balances on certain of their Bank of America accounts that the Bank finally decided to sever its

banking relationship with the First Nationle entities, prompting the Individual Defendants to transfer their accounts to another bank.

20.     Derline Cunningham followed the accounts, terminating her employment with Bank of America, and then relocating to the same bank.

21.     Bank of America's conduct allowed the First Nationle scheme to thrive for years through Bank of America accounts at a time when Bank of America had specifically investigated the Individual Defendants' practices, acquired specific knowledge of their wrongful conduct, and nevertheless continued to knowingly assist the Individual Defendants and their fraud.

22.     The SEC conducted an investigation of the fraud, which resulted in a civil enforcement action styled *SEC v. Santillo, et al.*, No. 18-CV-05491-JGK (S.D.N.Y.). The SEC action charges Santillo, Parris, Piccarreto, LaRocco, and Brenner with misappropriating funds and using them to pay redeeming investors "in classic Ponzi-scheme fashion." On June 22, 2018, the Court in the SEC action entered an Order to Show Cause and Temporary Restraining Order Freezing these Defendants' Assets (*See SEC v. Santillo*, ECF No. 6).

23.     This Class Action is brought by investors to recover their losses resulting from the Ponzi scheme designed by Santillo, Parris, Piccarreto, LaRocco, and Brenner, and aided and abetted by Bank of America.

## PARTIES AND RELEVANT NONPARTIES

### The Parties

Plaintiffs

24.     Plaintiff Mary Beth Heinert ("Mrs. Heinert") is a natural person over the age of 21 and is otherwise *sui juris*. Mrs. Heinert is a citizen of the State of Florida and resides in Marion County, Florida, within this judicial district.

25.     Richard H. Schultz, Jr. ("Mr. Schultz, Jr.") is natural person over the age of 21 and is otherwise *sui juris*. Mr. Schultz, Jr., is a citizen of the State of Florida and resides in Marion County, Florida, within this judicial district.

26.     Mrs. Heinert and Mr. Schultz, Jr., are the daughter and son of Richard H. Schultz ("Mr. Schultz") who passed away in Ocala, Florida, in May of 2016 at the age of 85. Between September of 2012 and February of 2015, Mr. Schultz invested approximately $263,430 in promissory notes issued by First Nationle Solutions and approximately $250,000 in membership interests issued by Percipience Global Corporation. Following Mr. Schultz's death, Mrs. Heinert and Mr. Schultz, Jr., each inherited one-half of Mr. Schultz's investments in First Nationle and Percipience, and both were damaged by the Defendants' conduct alleged herein.

27.     Mrs. Heinert also invested $450,000 of her own funds in membership interests in United RL between July of 2016 and September of 2016, and was further damaged because of the Defendants' conduct alleged herein.

<u>Defendants</u>

28.     **Bank of America** is a federally chartered, multinational financial services company headquartered in Charlotte, North Carolina. The Defendants below opened at least one hundred Bank of America accounts to maintain and propagate their Ponzi scheme.

29.     **Perry Santillo**, at or near age 38, is or was a resident of Rochester, New York. He founded First Nationle and acted as its CEO. Santillo offered investment opportunities in First Nationle, Percipience, and United RL.  He provided investment advice to investors and potential investors.

30.     **Christopher Parris**, at or near age 38, is or was a resident of Rochester, New York. He managed First Nationle, founded and owned Percipience, owned United RL, and owned Ocala

Investment Services (*see infra* ¶ 109). Parris offered investment opportunities in First Nationle, Percipience, and United RL. He provided investment advice to investors and potential investors.

31.     **Paul Anthony LaRocco**, at or near age 55, is or was a resident of Ocala, Florida. He founded, managed, and acted as CEO of United RL. He offered investment opportunities in First Nationle, Percipience, and United RL. He provided investment advice to investors and potential investors.

32.     **John Piccarreto**, at or near age 34, is or was a resident of San Antonio, Texas. Piccarreto offered investment opportunities in First Nationle, Percipience, and United RL. He provided investment advice to investors and potential investors.

33.     **Thomas Brenner**, at or near age 55, is or was a resident of Orrville, Ohio. Brenner offered investment opportunities in Percipience and United RL. He provided investment advice to investors and potential investors.

<u>**Relevant Nonparties**</u>

34.     **First Nationle Solutions, LLC**, is a Michigan corporation. It purports to conduct business in acquiring, selling, and improving commercial and residential real estate. However, First Nationle primarily operates as a Ponzi scheme.

35.     First Nationle issues promissory notes, solicits investor funds, misappropriates much of the solicited investor funds, and uses the remaining funds to pay redeeming investors. Santillo, Parris, LaRocco, Piccarreto, and potentially others, have induced at least 318 people to invest at least $46 million in First Nationle since 2012.

36.     **Percipience Global Corporation** is a Delaware corporation. It purports to provide loans for borrowers to buy and improve single-family homes.

37.     Percipience offers investors preferred stock. Class A shares have a one-year "lock period" and a claimed annual return of 7%. Class B shares have a three-year "lock period" and a claimed annual return of 8% with an 8% bonus upon initial investment. However, many investors never received a return on their investments because Percipience primarily operates as a Ponzi scheme. Santillo, Parris, Piccarreto, Brenner, and potentially others, have induced at least 229 people to invest at least $22 million in Percipience since 2012.

38.     **United RL Capital Services, LLC**, is a Michigan company. It purports to make loans to medical practices for the purpose of owning their own laboratories.

39.     United RL offers promissory notes with maturity dates of either one year or three years. Each type of note claims 7% interest payments will be paid semi-annually, and the three-year plan includes a 7% bonus upon initial investment. However, many investors never received a return on their investments because United RL primarily operates as a Ponzi scheme. Santillo, Parris, Piccarreto, Brenner, and potentially others, have induced at least 183 people to invest at least $25 million in United RL since 2015.

40.     Santillo, Parris, Piccarreto, LaRocco, Brenner, and potentially others, also sold investments in smaller offerings under the same fraudulent scheme. These schemes include, but are not limited to: (1) at least 41 people investing a total of $3.2 million in Boyles America, LLC; (2) at least 23 people investing a total of $3.8 million in Middlebury Development Corporation; (3) at least 14 people investing a total of $1.1 million in Lucian Development Corporation; and (4) at least 13 people investing a total of $758,000 in Torr, LLC.

41.     **Derline Cunningham** was the Rochester Branch Manager at Bank of America who served as the primary contact for the Individual Defendants beginning in 2005.  The Individual Defendants made a personal "loan" to Ms. Cunningham in 2016, at a time when they were having

financial problems of their own, which Ms. Cunningham never repaid.  When Bank of America closed the First Nationle Entities' and Individual Defendants' accounts in 2016, and terminated its banking relationship with them, Ms. Cunningham left Bank of America and followed the accounts, taking a position at the bank where the Individual Defendants transferred the accounts.

## JURISDICTION AND VENUE

42.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (*codified in* 28 U.S.C. §§ 1332, 1453, 1711–1715).  Diversity exists among the Plaintiffs and Defendants, there are hundreds of members of the putative Class, and the amount in controversy exceeds $5 million.  28 U.S.C. § 1332(d)(2).  In determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative Class members are aggregated.  28 U.S.C. § 1332(d)(6).

43.     This Court has personal jurisdiction over Defendant LaRocco because he is a Florida citizen and resident. This Court has jurisdiction over Defendants Santillo, Parris, Piccarreto, and Brenner because they participated in tortious acts and a conspiracy committed in Florida.  This Court has personal jurisdiction over Bank of America because it participated in tortious acts committed in Florida or caused damage to investors in Florida as alleged herein, and otherwise has sufficient minimum contacts with Florida arising from the specific conduct committed in or directed to Florida alleged herein.

44.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business, engaged in misconduct, or may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiffs Mary Beth Heinert and Richard H. Schultz, Jr., resided in the Middle District of Florida and a substantial portion of the practices complained of herein occurred in the Middle District of Florida.

45.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### Overview of the Ponzi Scheme

46.     Santillo and Parris hatched a scheme to buy books of business from investment advisors around the country. Then LaRocco, Piccarreto, and Brenner would use their established ties in their respective local communities to help Santillo and Parris solicit investors.

47.     LaRocco was a central figure in defrauding Floridian investors. He, Santillo, Parris, and potentially others raised at least $26 million from at least 147 Florida investors since 2012.

48.     Brenner's connections in Ohio allowed him, Santillo, Parris, and potentially others to raise at least $8 million from at least 74 investors since 2013.

49.     Piccarreto's specialty was defrauding Texans. He, Parris, and potentially others raised at least $6.6 million from at least 38 Texan investors since 2014.

50.     The scheme extended its reach to other states as well. Santillo and his associates defrauded at least 80 California investors of at least $21 million since 2012. Santillo raised $3.5 million from at least 33 investors in Pennsylvania since 2015. He also raised at least $2.2 million from at least 24 investors in Maryland since late 2017.

51.     In total, the Individual Defendants have raised at least $102 million from at least 637 investors since 2011 through fraudulent offerings.

### The Fraudulent Offering Materials

52.     Just like their investments, the Individual Defendants' offering and marketing materials were fraudulent and a sham.

53.     First Nationle's website states it is "engaged in leveraging investments, holdings, and other assets, while building value for investors." The First Nationle brochure provides claims that it is a holding company for "several sales affiliates that represent a group of companies who offer a rich portfolio of premier Insurance and Impaired risk products . . . These subsidiaries manage over $145 million in assets." First Nationle is not a holding company for any subsidiaries, much less subsidiaries with assets of $145 million.

54.     The First Nationle subscription agreement claims that it is "engaged in the business of senior market insurance program commerce and the development and management of diverse real property holdings." It further provides that the debtor's investment will "apply to the proceeds of the offering to help fund the debtor's outline business model" and that "[n]one of the proceeds from the offering will inure to the personal benefit of the Manager." The operating agreement identifies Santillo as the manager, while the subscription agreement states that Lucian Global, LCC is the manager. Parris is the manager of Lucian Global LLC, and thus co-manages First Nationle with Santillo.

55.     Instead of "leveraging investments, holdings, and other assets," First Nationle provided promissory notes to investors. The promissory notes contain maturity dates of three years, and provide for interest payments at an annual rate ranging from 3.3% to 6%, as well as bonuses of approximately 10% to 19% upon an initial investment. However, many investors never received any return on their investments.

56.     Using these fraudulent offering materials, Santillo, Parris LaRocco, Piccarreto, and potentially others, induced at least 318 investors to invest at least $46 million in First Nationle since 2012.

57.     Percipience's private placement memorandum claims that its business is to provide loans to borrowers to buy and improve single-family homes. It further claims that in the event of raising a maximum $5 million in the offering, $4.25 million (or 85% of the proceeds) will be used for Percipience's business, with the remainder of the proceeds to be spent on expenses such as brokers' fees. Percipience's operating agreement claims that it "shall purchase . . . stand-alone homes or . . . flats within a multi-family building" and "lease residences to families supported by governmentally funded rent subsidies. . . ."

58.     Percipience conducts nothing more than minimal business functions, to create the illusion of legitimacy. In reality, Percipience primarily offers investors sham stock investments with claimed annual returns of 7% or 8% (some with 8% bonuses upon initial investment). However, many investors never received any return on their investments.

59.     Using these fraudulent offerings, Santillo, Parris, Piccarreto, Brenner, and potentially others, induced at least 229 people to invest at least $22 million in Percipience since 2012.

60.     The United RL brochure and memorandum claims that its business is to make loans to physicians or medical practices for owning their own laboratories. Its website purports that it "is a singular-disciplined company that specializes in providing Physician's financing, supporting the initial development phases of Physician owned clinical laboratories." The operating agreement states United RL engages in "the direct or indirect (i) financing of medical-laboratory acquisitions and/or operations owned by third parties, and (ii) conduct of all commercial operations related thereto or supportive thereof."

61.     United RL conducts nothing more than minimal business functions, to create the illusion of legitimacy.  Instead, United RL offered promissory notes to investors that had maturity

12

dates of either one year or three years. Each type of note claims 7% interest payments will be paid semi-annually, and the three-year plan includes a 7% bonus upon initial investment. However, many investors never received any return on their investments.

62.     Santillo, Parris, Piccarreto, Brenner, and potentially others, have used United RL offering materials to induce at least 183 people to invest at least $25 million since 2015.

## The Misrepresentations, Misappropriations, and Breaches of Fiduciary Duty

63.     The Individual Defendants misrepresented that First Nationle, Percipience, United RL, and the other issuers conduct the purported business of each respective issuer. In reality, the investors' funds are often used to repay redeeming investors or misappropriated for the Individual Defendants' use.

64.     After receiving investments, the Individual Defendants commingled the investors' funds and transferred those funds through multiple accounts under the Individual Defendants' control. Substantial amounts of these funds were used to pay redeeming investors or to line the pockets of the Individual Defendants. In some cases, Santillo transferred nearly all of an investor's deposit to himself.

65.     The Individual Defendants also misrepresented the performance of the investments. They provided account statements that falsely stated the funds were invested in the issuing companies. Other statements falsely stated returns and bonuses. In some cases, the Individual Defendants did provide investors with returns and bonus, but these were Ponzi payments from new investor funds. The Individual Defendants often failed to fulfill the requests of other investors who wished to redeem.

66.     Each of the Individual Defendants acted as an investment advisor. Santillo purchased several investment advisory businesses, and then continued the business by acting as an

adviser and receiving compensation through the misappropriation of investors' funds. The other Individual Defendants similarly provided investment advice, purportedly in the investors' best interests, and each received compensation through misappropriated funds. The Individual Defendants breached their fiduciary duties to the investors when they failed to use investor funds as they represented they would and to put their customers' interests before their own.

67.     Of the at least $102 million raised by the Individual Defendants, at least $38.5 million was paid to redeeming investors in Ponzi payments, at least $20 million was transferred to the Individual Defendants' bank accounts, and a large portion was transferred elsewhere in transactions that do not appear related to the purported businesses.

68.     Additional bank records for a First Nationle account show more misappropriated funds. From February 2013 through December 2016, Santillo netted an additional $3.2 million. The account also reflects $3.9 million of credit card payments noting "Perry Santillo" in the payment information. Preliminary review shows that through this account, Defendants received approximately $8.1 million of funds from investors and paid back approximately $375,000 of funds to likely investors.

### The Fraudulent Bank Transfers

69.     As set forth above, Santillo, Parris, LaRocco, Piccarreto, and Brenner would prey upon their victims by presenting brochures and investment models to them for one or more of their businesses — of which each business was part of the Individual Defendants' single and integrated fraudulent scheme. The businesses and marketing materials were uniformly fraudulent in that Santillo, Parris, LaRocco, Piccarreto, and Brenner never told investors that a significant portion of the proceeds for each business would be commingled, used to repay redeeming investors, or misappropriated for personal use.

70.     Upon receiving an investment, the funds would usually be directly deposited into a Bank of America account held in the name of Percipience or another account held in the name of United RL, and eventually to one or more Bank of America accounts under the First Nationle name. Investor funds were commingled and fraudulently transferred in the same manner without distinguishing between the entities in which the funds were originally invested.

71.     Funds invested in Percipience usually went directly into one of its accounts at Bank of America. Percipience's accounts at Bank of America would have balances of a few hundred dollars each, then would receive investor funds, often in an amount over $100,000. Within the same day or week, all or most of the investor funds would be transferred to another account at Bank of America with the name of a company under the Individual Defendants' control. These accounts would have small or zero balances, but would transfer the funds, almost immediately upon receiving them, to another affiliated account at Bank of America, to redeeming investors, or to one of the Individual Defendants' personal Bank of America accounts.

72.      Funds invested in First Nationle usually weaved their way through the web of Bank of America accounts in the name of the Individual Defendants' smaller businesses before finding one of First Nationle's accounts at Bank of America. These funds often came from Bank of America accounts that had little or no balance before receiving an influx of investor funds. Then, almost immediately, the funds were transferred to one of the Individual Defendants' personal accounts, another affiliated business, or First Nationle. Once under the control of First Nationle, the funds would typically be redistributed to redeeming investors or to one of the Individual Defendants' personal accounts. An example of a series of transactions from March 4, 2015, through March 6, 2015, illustrates this practice:

   a.     Percipience's Bank of America account had a balance of $717.01 on March 3, 2015. It received $450,000 from investors over the next two days.

b. Between March 4 and 6, the Percipience account transferred $405,000 to Middlebury Development's Bank of America account, which is an affiliated business under the Individual Defendants' control that had a previous balance of $134.

c. On March 5, Middlebury's account transferred $5,000 to Mr. Piccarreto and $401,500 to Lucian Development's Bank of America account, which is also under the Individual Defendants' control and had a previous balance of about $3,000.

d. Also on March 5, Lucian's account transferred $16,500 to Mr. Piccarreto. The next day, Lucian paid $15,000 to a likely redeeming investor, $13,500 to another affiliated business's Bank of America account, approximately $11,000 to an IRA custodian, and $284,000 to one of First Nationle's Bank of America accounts.

e. First Nationle's account had a negative balance of about –$46 before receiving the $284,000. Upon receiving the funds, it immediately transferred $18,000 and $50,000 to two separate Bank of America accounts under the Individual Defendants' control, and those accounts transferred funds to a payroll company. The same day, First Nationle's account sent $172,800 to Santillo's personal Bank of America account.

73. United RL was created in 2015. Since then, it has had investors deposit funds, often in excess of $100,000, directly into a bank account in its name. Many series of transactions show that within the same day or week, United RL would transfer all or most of the investor deposits into Middlebury Development's Bank of America account (the same account to which Percipience repeatedly transferred funds). Once in Middlebury's account, the funds typically went from account to account within Bank of America's system in a similar pattern to that described in the preceding paragraphs.

74. These rapid movements of funds among accounts, including the commingling and ultimate misappropriation of investor funds through personal accounts at Bank of America, were red flags which required Bank of America to investigate the accounts immediately.

75. Additional examples of suspicious account activity include:

**Mid-July 2014 Transactions**

76.     On July 9, 2014, Percipience's Bank of America account had a balance of $451.61. The next day, it received $201,000 from two investors, and it received an additional $20,000 on July 14.

77.     On July 15, 2014, Percipience transferred $187,200 to the Middlebury account, which had a previous balance of $0.00.

78.     That same day, Middlebury transferred $165,000 to Lucian Development's Bank of America account and paid $22,125 to a law firm.

79.     Also on that day, Lucian sent $15,000 to Christopher Parris's Bank of America account, $15,000 to an unknown source, and $35,000 to a Bank of America account under First Nationle's name.

80.     On July 16, 2014, Lucian sent $71,500 to a likely redeeming investor.

**Late-July 2014 Transactions**

81.     From July 21 to July 29, 2014, a First Nationle account at Bank of America received $233,000 from a single investor and $532,859 from six likely investors.

82.     That same week, the First Nationle account paid $480,000 to Santillo's Bank of America account, but received $370,000 from the same Santillo account on July 28, 2014.

83.     Also during this week, First Nationle paid $73,087 to likely redeeming investors, $75,500 in property taxes, $12,000 to another Bank of America account under the Individual Defendants' control, and transferred $440,500 to Lucian Development's Bank of America account, which had a previous balance of $3,560.

84.     Almost immediately, Lucian sent $164,000 to three likely redeeming investors. It also sent $126,562 to a business associate, $31,500 to another Bank of America account under the Individual Defendants' control, and approximately $70,000 to an escrow company.

**September 2016 Transactions**

85.     On September 7, 2016, Middlebury's Bank of America account had a balance of $9,927.76. Over the next two days, it received $435,000 from United RL.

86.     During the same two days, it transferred $400,000 to Lucian Development's Bank of America account and $10,000 to Percipience's Bank of America account.

87.     Percipience then paid approximately $9,400 to a likely redeeming investor.

88.     Upon receiving $400,000, Lucian immediately sent $25,840 to a payroll company, $10,837 to Defendant Piccarreto, and $303,000 to First Nationle's Bank of America account.

89.     On September 8 and 9, First Nationle paid approximately $188,000 to two likely redeeming investors, $15,000 to a likely lender, and $30,450 to Santillo's personal Bank of America account.

**Applicable Banking Regulations**

90.     Bank of America knowingly violated federal banking regulations by its conduct relating to the scheme perpetuated by Santillo, Parris, Piccarreto, LaRocco, and Brenner.  Under federal law, banks are required to know their customers and understand their banking behavior. Under relevant banking regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. § 1020.220(a)(1), (2).  In order to do so, banks are required to collect information about the holder of each account. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

91.     Bank of America is bound to comply with the Bank Secrecy Act ("BSA"), a federal statute designed to detect and prevent money laundering.

92.     In accordance with their federal and state regulatory compliance obligations, banks must develop, administer, and maintain a program that ensures compliance with the BSA.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

93.     Banks must develop a customer due diligence program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, which provides the bank with a way to identify unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

94.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

95.     Banks must also identify a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA.  The compliance officer must designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

96.     The federal government established the Federal Financial Institutions Examinations Council ("FFIEC") in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions.  The FFIEC's Bank Secrecy Anti-Money Laundering Manual contains an overview of BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures.  The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies such as the Federal Reserve, Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual p. 5 (2010).

97.     Banks must also ensure that their employees follow BSA guidelines.  Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations.  Accordingly, banks are required to train all personnel whose duties may require knowledge of the BSA on the requirements under the BSA.

98.     Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual, including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the accountholder's business; (4) transfers of funds among related accounts; (5) loans that are secured by account deposits; (6) loans that lack a legitimate business purpose, provide the bank with excessive fees for assuming little or no risk, or obscure movement of funds; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (8) transacting businesses sharing the same address.

## Bank of America's Knowledge and Substantial Assistance

99.     Bank of America and its Branch Manager Derline Cunningham began a banking relationship with the Individual Defendants — in particular Santillo and Parris — in Rochester, New York in or around 2005 when the Individual Defendants opened an account for Lucian. Additional First Nationle Entities were formed in 2009, with a focus on real estate investments, and had corresponding accounts opened at the Bank. Santillo and Parris had a practice of creating a corporate entity, and a corresponding bank account, for each property they acquired as part of their investment portfolio to pitch to investors.

100.    In or around 2014, consistent with their practice, Santillo and Parris opened a series of Bank of America accounts for various First Nationle Entities. Santillo and Parris's account practices triggered an internal Bank of America investigation.

101.    As part of the Bank's investigation, Bank representatives questioned Parris by email, and then at an in-person meeting. They interrogated him regarding the unusual nature of the account openings, the unusual quantity of account openings, and the atypical nature and amount of the transfers being processed through the First Nationle accounts. Representative atypical and suspicious transfers are set forth above, *see* ¶¶ 72, 76–89, *supra*.

102.    Bank of America also questioned Santillo in person in connection with the Bank's investigation.

103.    Notwithstanding the Bank's investigation, Bank of America did nothing for two subsequent years, continuing to serve as the fraud's primary banking institution until 2016, during which time the Individual Defendants continued and expanded their fraudulent scheme.

104.    In or around 2015, the Individual Defendants — and in particular Santillo and Parris — began experiencing financial difficulties.  To address these difficulties, and prevent the collapse

of their scheme, they sought and secured short-term, high interest loans from various non-traditional lending institutions. Once secured, Santillo and Parris set up these loans to automatically debit from various of the First Nationle accounts at Bank of America.

105.    Also in or around 2015, Santillo and Parris learned that their long-time and primary Bank of America contact, Branch Manager Derline Cunningham, was dealing with her own financial difficulties. Despite their own financial troubles, they made Cunningham a personal financial "loan."

106.    Upon information and belief, Cunningham never repaid the "loan," and Santillo, Parris, and Cunningham never expected or contemplated repayment.

107.    Cunningham's acceptance of the "loan," and any other financial accommodations from the Individual Defendants, violated internal Bank policies and procedures regarding conflicts of interest, as well as the Bank's code of ethics. Specifically, any financial accommodation Cunningham received from a Bank client was either prohibited or needed to be disclosed to the Bank, to ensure that Cunningham, as a Bank representative, put the interests of the Bank ahead of any personal interests, financial or otherwise.

108.    Upon information and belief, Cunningham never disclosed her financial accommodation to the Bank, for the benefit of preserving her long-time relationship with the Individual Defendants — a relationship that continued when both Cunningham and the Individual Defendants transitioned to another bank.

109.    Santillo and Parris's financial difficulties persisted well after their "loan" to Cunningham. In or around 2016, they began incurring negative balances on those Bank of America accounts linked to the short-term, high-interest loans secured in 2015.

110.     With insufficient funds in the Individual Defendants' accounts, the Bank finally, in 2016, decided to sever its banking relationship with the Individual Defendants. The Bank advised Santillo and Parris in writing that it would no longer conduct business with First Nationle and that any questions regarding the termination should be directed to the legal department.

111.     With their relationship with Bank of America finally severed, the Individual Defendants transitioned their banking relationship to another bank.

112.     Derline Cunningham followed the accounts, leaving Bank of America and then relocating to the same bank.

113.     Bank of America and its representatives, including Derline Cunningham, had a well-established obligation under banking laws, regulations, and internal policies and procedures to know their customer, to identify and monitor suspicious activity (such as the suspicious activity identified above), and to report such suspicious activity to appropriate personnel for further investigation and possible reporting to governmental authorities.

114.     Bank of America also had an obligation under its own policies, industry standards, and regulatory guidelines to refrain from participating in suspicious transactions.

115.     There were many red flags that alerted Bank of America to illegal conduct in the administration and use of investor funds, including, but not limited to, the rapid and significant number of transfers in and out of the Bank of America accounts to effect commingling of investor funds, and ultimately the misappropriation of investor funds through personal Bank of America accounts belonging to the Individual Defendants.

116.     Bank of America acquired specific knowledge of the atypical and suspicious nature of these transaction when the Bank conducted an internal investigation in 2014 during which they questioned the unusual nature of the Individual Defendants' account openings, the unusual

quantity of their account openings, and the atypical nature and amount of the transfers being processed through their First Nationle accounts.

117.    Based on the obviously suspicious nature of the activity in the Bank of America accounts set forth above, and because Bank of America knowingly engaged in banking transactions that were directly related to the scheme despite its knowledge of the Individual Defendants' wrongful conduct, Bank of America and its representatives necessarily failed to adhere to regulatory guidance, banking industry standards, and its own policies with regard to its involvement in this fraud. Bank representatives should have reported suspicious activity and declined to participate in any transactions that might assist in furtherance of the scheme.

118.    Even before its investigation, as part of the account opening and monitoring protocols, Bank of America knew that the Individual Defendants' accounts were opened in connection with purported investments in financial services, insurance, real estate development, and medical laboratories, but instead were used to fund the Individual Defendants' lavish lifestyle, including homes across the country, cars, expenses at a country club and Las Vegas resort and casino, credit card payments, and other personal expenses.

119.    Bank of America had actual knowledge that the Individual Defendants were using Bank of America accounts to engage in illicit activity, and willingly assisted the fraud anyway.

120.    Bank of America's conduct allowed the Ponzi scheme to survive, because the Individual Defendants needed a constant source of funds to repay previous investors or the scheme would collapse.

121.    In fact, the scheme did collapse on or about June 2018 with the filing of the SEC action.  However, the Individual Defendants could not have run this scheme undetected for so many years without Bank of America's knowing and substantial assistance.

122.     Had Bank of America not enabled the scheme and processed the intricate web of transfers implemented by the Individual Defendants to commingle and ultimately misappropriate investor funds, investors would not have timely received their payments and the fraud would have collapsed. On various occasions, including examples set forth above, the Bank of America accounts would have had balances insufficient to cover payments to investors without Bank of America enabling the Individual Defendants' rapid movement and diversion of funds.

123.     Insufficient balances in the accounts would have led to late or missing payments, or checks from the Bank of America accounts being returned — and any failure or delays in payment would have led the investors to inquire and complain when they stopped receiving payments, which would have led to the intervention of regulators.

124.     Bank of America also failed to report obvious suspicious activity, even after conducting its own investigation, which allowed the Bank of America accounts — the Individual Defendants' primary accounts for their scheme — to stay open when they should have otherwise been closed.

125.     Bank of America thus sustained and prolonged the Ponzi scheme.

126.     Inquiry into the red flags related to the scheme would have also led to further investigation and intervention by the regulatory authorities. This, in turn, could have uncovered the fraud, just as it was uncovered in June 2018, and so ceased the operation of the scheme.

127.     In addition to further investigation, circumstances in this case dictated that regulatory and law enforcement authorities should have been contacted directly because of the nature of the crime being committed and the Bank's risk of being associated with illegality (this was an ongoing crime — substantial sums of money were continuing to be stolen from victims).

128.    Bank of America can and does close accounts where, under circumstances like those set forth above, the Bank risks being associated with illegality. Indeed, banks like Bank of America can close accounts at any time, and under these circumstances there was no legitimate reason to allow the Individual Defendants' accounts to remain open.

129.    Even in instances where banking laws require that a particular transaction be completed, Bank of America could have closed the account and suspended further transactions. This closure of the Individual Defendants' accounts would have had several effects. First, it would have prevented any further transactions such as the suspicious transactions detailed above. Second, failure or delays in payment would have led investors to inquire and complain when they stopped receiving payments. Finally, account closure would have also led to regulatory intervention.

**Plaintiffs' Investments in the Ponzi Scheme**

130.    Plaintiffs Heinert and Schultz sustained damages as a result of their investments in the Ponzi scheme perpetuated by Santillo, Parris, Piccarreto, LaRocco, and Brenner, and aided and abetted by Bank of America. The details of each Plaintiff's investment follow.

### *Mary Beth Heinert and Richard H. Schultz, Jr.*

131.    Mrs. Heinert and Mr. Schultz, Jr. are the daughter and son of Richard H. Schultz ("Mr. Schultz") who passed away in Ocala, Florida, in May of 2016 at the age of 85.

132.    Prior to 2013, Mr. Schultz was a client of financial adviser Kenneth E. Smith, III, who offered financial advisory services through his company, KE Smith Tax Advisory Group, Inc., doing business under a fictitious name, USA Tax & Financial Consultants, located at 3220 Southwest 31st Street, Suite 202, Ocala, Florida.

133.    In 2012, Mr. Smith sold his financial advisory business and its fictitious name to Ocala Investment Services, LLC ("OIS"), which is owned and managed by Defendant Christopher Parris.

134.    Although barred from registration with the Financial Industry Regulatory Authority in 2010, Defendant Paul LaRocco was employed by OIS to manage its newly acquired financial advisory business with the intention that he would succeed to the role of financial advisor for Mr. Smith's clients, including Mr. Schultz.  Pursuant to this plan, Mr. LaRocco became Mr. Schultz's financial advisor. Defendant Parris's brother, Ben Parris, also held himself out as an officer or manager of OIS.

135.    Between September of 2012 and February of 2015 — the same period during which Bank of America was conducting an internal investigation into the Individual Defendants' scheme — Mr. LaRocco persuaded Mr. Schultz to invest $263,430 in promissory notes issued by First Nationle Solution, LLC, and $250,000 in membership interests issued by Percipience Global Corporation.

136.    Following Mr. Schultz's death, Mrs. Heinert and Mr. Schulz, Jr., each inherited one-half of Mr. Schultz's investments in First Nationle and Percipience.

137.    In addition, Mr. LaRocco persuaded Mrs. Heinert to invest additional funds in United RL Capital Services, which he held out as being in the business of arranging financing for physicians and medical organizations who wished to establish their own medical laboratories.

138.    In July of 2016, Mrs. Heinert invested $350,000 in membership interests in United RL.

139.    Two months later, in September of 2016, Mrs. Heinert made a second investment of $100,000 in United RL.

140.    Plaintiffs' investments were held in and transferred among various Bank of America accounts and used as part of the Ponzi scheme to either pay earlier investors or misappropriated by the Individual Defendants to their private accounts.  Plaintiffs also received small "dividends" from Bank of America, which were paid to them as part of the Ponzi to give the scheme an air of legitimacy.

141.    Mrs. Heinert and Mr. Schultz, Jr. never received a return of the majority of their investments.

142.    There are no material differences between Defendants' actions and practices directed to Plaintiffs and their actions and practices directed to the putative Class members.

## **TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION**

143.    Plaintiffs and Class members did not and could not have discovered the facts constituting Defendants' violations until the SEC filings were made available to the public on June 18, 2018.

144.    Defendants concealed their wrongdoing, and Bank of America's assistance therein, by carrying out the complex series of transactions through which Plaintiffs' funds were misappropriated, commingled, and misused.

145.    The Individual Defendants also concealed the Ponzi scheme by misrepresenting the performance of the investments to investors. They provided account statements that falsely stated the funds were invested in the issuing companies. Other statements falsely stated returns and bonuses

146.    Plaintiffs learned of the actions of the Individual Defendants and Bank of America — directly or indirectly — through the SEC action and media coverage about them.

147.     Because Plaintiffs and the Class could not have reasonably discovered the facts constituting Defendants' violations until June 18, 2018, their claims accrued on that date and any applicable statutes of limitation were tolled until that date.

## CLASS ACTION ALLEGATIONS

148.     Plaintiffs bring this lawsuit as a Class Action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

149.     The Class is defined as:

**All persons who invested in First Nationle Solutions, Percipience Global, United RL, Lucian Development, and Middlebury Development.**

150.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

151.     The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

152.     <u>Numerosity</u>. The Class consists of more than 600 geographically dispersed individuals.  Joinder of the Class members is not practicable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

153.     <u>Ascertainability</u>. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Santillo, Parris, Piccarreto, LaRocco, and Brenner as well as through an examination of Bank of America's records. Notice of this action can thus be provided to all members of the proposed Class.

154.     <u>Typicality</u>. Plaintiffs were investors in the businesses owned and managed by Santillo, Parris, Piccarreto, LaRocco, and Brenner at the time of the wrongdoing alleged herein. Plaintiffs' claims are typical of the claims of all Class members as all Class members are similarly affected by Defendants' wrongful conduct as complained of herein.

155.     Adequacy. Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation, including litigation relating to investment fraud. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

156.     Commonality and Predominance. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to:

    a.    Whether the offering materials approved for each business were fraudulent;

    b.    Whether the Individual Defendants knew that the offering materials for each of the businesses were fraudulent and substantially assisted the fraud that was carried out against the investors;

    c.    Whether the Individual Defendants breached their fiduciary duties to the investors in the businesses;

    d.    Whether Bank of America aided and abetted the Individual Defendants' fraud and breaches of their fiduciary duty; and

    e.    Whether Bank of America knowingly disregarded atypical banking activity and other red flags that indicated that the Individual Defendants' were committing investor fraud, breaching fiduciary duties, and misappropriating investor funds.

157.     The Class may be certified under Rule 23(b)(3). Questions of law or fact common to Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

## COUNT I – AIDING AND ABETTING COMMON LAW FRAUD
### (against Bank of America)

Plaintiffs re-allege and incorporate paragraphs 1–142 and 174–185 as if fully set forth herein.

158.    Bank of America had actual knowledge of the fraud that was being committed by Santillo, Parris, Piccarreto, LaRocco, and Brenner. In addition to what is set forth above, the facts that indicate the actual knowledge of the fraud include, for example, the following:

    a.    Since 2005, Santillo, Parris, Piccarreto, LaRocco, or Brenner were in frequent contact with Bank of America — including Branch Manager Derline Cunningham — to open at least one hundred Bank of America accounts, including accounts in the name of their fraudulent businesses as well as personal accounts used to divert and misappropriate investor funds;

    b.    Throughout the relationship, Bank of America knew that each of the businesses controlled by the Individual Defendants was involved with the purported investment opportunities of First Nationle, Percipience, or United RL (among others), relating to financial services, insurance, real estate development, or medical laboratories;

    c.    Bank of America knew — as a result of its account opening and monitoring practices as well as its 2014 internal investigation into the Individual Defendants' practices — that the Individual Defendants received investor funds into Bank of America accounts and that, rather than being applied to the investment opportunities for which they were intended, the funds were commingled and misappropriated, either being used to pay off earlier investors, or stolen to fund the Individual Defendants' lavish lifestyles; and

    d.    Bank of America's employee and agent, Derline Cunningham, took financial compensation for her assistance with Plaintiffs' fraudulent scheme, and left Bank of America to follow the Individual Defendants' and First Nationle Entities' accounts soon after Bank of America terminated its banking relationship with the Individual Defendants.

159.    Over the course of the business relationship of many years between Bank of America and the other Defendants, Bank of America rendered substantial assistance to Santillo, Parris, Piccarreto, LaRocco, and Brenner in commission of their fraud against the investors by, among other things, the following acts:

a.  Bank of America released monies to the personal accounts of the other Defendants and the accounts of the affiliated businesses knowing that the funds were designated for investments in various the Individual Defendants' investment opportunities. By participating in hundreds of transactions of this type, Bank of America assisted in the misuse and commingling of the funds that Santillo, Parris, Piccarreto, LaRocco, and Brenner obtained by fraud against the investors;

b.  Bank of America lent an air of legitimacy to the fraud in that Bank of America received the investors' funds and purported to hold the funds in a secure manner;

c.  Bank of America ignored government regulations, its own policies, and numerous red flags raised by the Individual Defendants atypical banking activities which allowed the fraud to persist for many years undetected; it was not until the Individual Defendants depleted their funds and began to incur negative account balances on Bank of America accounts that the Bank finally severed its relationship with the Individual Defendants and the First Nationle entities; and

d.  Upon information and belief, the Individual Defendants received further assistance from Branch Manager Derline Cunningham, with whom they had a long-standing relationship since at least 2005 — a relationship that included financial accommodations in the form of at least one "loan" which was never repaid and violated Bank policies and procedures. Upon information and belief, Ms. Cunningham assisted in keeping the Individual Defendants' accounts open despite the suspicious activity being conducted. Cunningham's willingness to assist the Individual Defendants is further supported by her relocation to the bank where the Individual Defendants moved their accounts in or around 2016, when Bank of America severed its banking relationship with the Individual Defendants.

160.  The specific misconduct that gives rise to this claim for aiding and abetting common law fraud was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and therefore an award of punitive damages is appropriate.

161.  By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment against Bank of America for compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against Bank of America)

Plaintiffs re-allege and incorporate paragraphs 1–142 and 186–191 as if fully set forth herein.

162.    Because Santillo, Parris, Piccarreto, LaRocco, and Brenner held themselves out to be investment advisers, each of them owed fiduciary duties to the investors. The fiduciary duties apply by operation of law and the terms of the investments, which state that Santillo, Parris, Piccarreto, LaRocco, and Brenner have a "general-and-unsubordinated obligation" to the investor.

163.    Santillo, Parris, Piccarreto, LaRocco, and Brenner breached the fiduciary duties directly owed to the investors by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

164.    Bank of America substantially assisted in the breaches of fiduciary duty by the other Defendants with knowledge that the other Defendants were breaching the fiduciary duties owed to Plaintiffs and the Class.

165.    Because of the breaches of fiduciary duties directly owed to the investors, Plaintiffs and the Class suffered damages.

166.    The specific misconduct that gives rise to this claim for aiding and abetting fiduciary breach was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and therefore an award of punitive damages is appropriate. In addition, senior management of Bank of America engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

167.   By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### COUNT III – CIVIL CONSPIRACY
### (against Bank of America, Santillo, Parris, Piccarreto, LaRocco, and Brenner)

Plaintiffs re-allege and incorporate paragraphs 1–142 as if fully set forth herein.

168.   At all relevant times, and as early as 2005, each of Bank of America, Santillo, Parris, Piccarreto, LaRocco, and Brenner was a principal, agent, alter ego, joint venture, partner, or affiliate of these other defendants, and in doing the acts alleged herein, was acting within the course and scope of that principal agent, alter ego, joint venture, partnership, or affiliate relationship. Each Defendant had actual or constructive knowledge of the acts of the other, and ratified, approved, joined in, acquiesced, or authorized the wrongful acts of the co-Defendant, or retained the benefits of said wrongful acts.

169.   Bank of America, Santillo, Parris, Piccarreto, LaRocco, and Brenner, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other, and others, in perpetrating their unlawful, unfair or fraudulent scheme on Plaintiffs and the Class. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other wrongdoings complained of, each of Bank of America, Santillo, Parris, Piccarreto, LaRocco, and Brenner acted with an awareness of their primary wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing herein alleged.

170.   The Defendants committed overt acts in furtherance of their conspiracy as alleged above, including but not limited to:

a.      Santillo, Parris, Piccarreto, LaRocco, and Brenner used the fraudulent offering materials to induce Plaintiffs and the Class into investing money in the businesses with the substantial aid and assistance of Bank of America;

b.      Santillo, Parris, Piccarreto, LaRocco, and Brenner misused investors' funds to pay redeeming investors through Bank of America accounts;

c.      Santillo, Parris, Piccarreto, LaRocco, and Brenner misused and misappropriated investors' funds by transferring investors' funds into their business and personal Bank of America accounts;

d.      Bank of America disregarded specific knowledge of wrongful conduct that it acquired during its 2014 internal investigation into the Individual Defendants' practices. For example, the Bank had knowledge, but disregarded, that the Individual Defendants received investor funds into Bank of America accounts and that, rather than being applied to the investment opportunities for which they were intended, the funds were commingled and misappropriated, either being used to pay off earlier investors, or stolen to fund the Individual Defendants' lavish lifestyles.

e.      Upon information and belief, through its employee and agent, Derline Cunningham, Bank of America agreed to assist in keeping the Individual Defendants' accounts open despite the suspicious activity being conducted.

171.    As a direct and proximate consequence of Defendants' conduct as described in the foregoing, Plaintiffs and the Class have lost money they invested in the businesses, have been denied the use of their money, and have been damaged thereby in an amount to be determined at trial.

172.    The specific misconduct that gives rise to this claim for civil conspiracy was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.  In addition, in the case of Bank of America, senior management of the entities engaged in such conduct, or knowingly condoned, ratified or consented to such conduct.

173.     By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### COUNT IV – COMMON LAW FRAUD
### (against Santillo, Parris, Piccarreto, LaRocco, and Brenner)

Plaintiffs re-allege and incorporate paragraphs 1–142 as if fully set forth herein.

174.     Santillo, Parris, Piccarreto, LaRocco, and Brenner participated in the preparation and dissemination of the offering materials to the Plaintiffs and the Class, which offering materials were uniformly fraudulent.

175.     The offering materials were delivered to all investors before each of them invested in the businesses.

176.     None of the offering materials disclosed to investors that their investments would be misappropriated, commingled, or misused.

177.     The offering materials were uniformly fraudulent in that these documents concealed and misrepresented various material facts, including, without limitation, that Santillo, Parris, Piccarreto, LaRocco, and Brenner considered themselves free to use, and did use, investor funds for purposes inconsistent with those described in the offering materials, including, but not limited to, the following: (a) the funds would go to the personal benefit of Santillo, Parris, Piccarreto, LaRocco, and Brenner; (b) investor funds would not be used to conduct business in the financial services industry; (c) investor funds would not be used for real estate development; (d) investor funds would not be used to provide loans to borrowers to buy and improve single-family homes; (e) investor funds would not be used to finance physician-owned toxicology laboratories.

178.     The offering materials were uniformly fraudulent in that these documents concealed and misrepresented material aspects of the financial structure that was conceived of and

implemented by Santillo, Parris, Piccarreto, LaRocco, and Brenner for the businesses to facilitate and conceal misuse, and commingling of investors' funds.  For example, the offering materials concealed or misrepresented that: (a) scores of transactions were being undertaken between bank accounts controlled by the Individual Defendants such that the investor funds were being commingled; (b) the investor funds would be misappropriated to personal accounts controlled by the Individual Defendants; and (c) the investor funds would be used to pay redeeming investors.

179.    Santillo, Parris, Piccarreto, LaRocco, and Brenner had actual knowledge of the omissions in the offering materials, because, among other things, they drafted, reviewed or approved the offering materials before such were disseminated to the investors.

180.    Santillo, Parris, Piccarreto, LaRocco, and Brenner knew that the financial structure they created was not disclosed in the offering materials and that this financial structure was contrary to what was represented in the offering materials.

181.    Santillo, Parris, Piccarreto, LaRocco, and Brenner intended that investors would rely on the offering materials in investing in the businesses.

182.    Each of the Plaintiffs reviewed and relied upon the offering materials provided to him or her to invest in one or more of the businesses. The offering materials for each business, although containing different details regarding the goals and methods of the investments, were uniformly fraudulent for the reasons stated above.

183.    Plaintiffs and the entire Class have suffered substantial injury as a result of having reviewed and relied upon the uniformly fraudulent offering materials to invest in excess of $100 million in the businesses.

184.    The specific misconduct that gives rise to this claim for common law fraud was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care

that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

185.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (against Santillo, Parris, Piccarreto, LaRocco, and Brenner)

Plaintiffs re-allege and incorporate paragraphs 1–142 as if fully set forth herein.

186.    Because Santillo, Parris, Piccarreto, LaRocco, and Brenner held themselves out to be investment advisors, each of them owed a fiduciary duty to the investors.

187.    The fiduciary duties apply by operation of law and the terms of the investments, which state that none of the proceeds from the offerings will go to the benefit of Santillo, Parris, Piccarreto, LaRocco, or Brenner and that they each have a "general-and-unsubordinated obligation" to the investor.

188.    Santillo, Parris, Piccarreto, LaRocco, and Brenner breached the fiduciary duties directly owed to the investors by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

189.    Because of the breach of fiduciary duties that Santillo, Parris, Piccarreto, LaRocco, and Brenner owed to the investors, Plaintiffs and the Class suffered damages.

190.    The specific misconduct that gives rise to this claim for breach of fiduciary duties was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and, therefore, an award of punitive damages is appropriate.

191.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendants as follows:

1.    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

2.    Awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

3.    Awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

4.    Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

5.    Awarding such other and further relief the Court deems just, proper, and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 20th day of September 2018.

| | |
|---|---|
| /s/*Harley S. Tropin* <br> Harley S. Tropin, Esq. (Trial Counsel) <br> Florida Bar No. 241253 <br> hst@kttlaw.com <br> Tal J. Lifshitz, Esq. <br> Florida Bar No. 99519 <br> tjl@kttlaw.com <br> Robert J. Neary, Esq. <br> Florida Bar No. 81712 <br> rn@kttlaw.com <br> **KOZYAK TROPIN &** <br> **THROCKMORTON LLP** <br> 2525 Ponce de Leon Blvd., 9th Floor <br> Coral Gables, FL 33134 <br> Telephone:   (305) 372-1800 <br> Facsimile:    (305) 372-3508 <br><br> *Counsel for Plaintiffs* | George Franjola, Esq. <br> Florida Bar No. 333271 <br> gfranjola@ocalalaw.com <br> **GILLIGAN,  GOODING,  FRANJOLA &** <br> **BATSEL, P.A.** <br> 1531 SE 36th Ave. <br> Ocala, FL 34471 <br> Telephone:      (352) 867-7707 <br> Facsimile:       (352) 867-0237 <br><br> *Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of September, 2018, a true copy of the foregoing has been filed with the Clerk of the Court using CM/ECF and is served on all counsel or parties of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Harley S. Tropin*